UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
LGN INTERNATIONAL, LLC, and,
PRUDENT INVESTIMENTOS LTDA,                                          Docket No.

                        Plaintiffs,                                 **COMPLAINT**

                                                                    **JURY DEMAND**

   -against-

HYLAN ASSET MANAGEMENT, LLC,
ANDREW SHAEVEL,
BAHAMAS MARKETING GROUP,
JOEL TUCKER,
SQ CAPITAL, LLC,
JT HOLDINGS, INC.,
HPD LLC,
HIRSCH MOHINDRA,
and
MAINBROOK ASSET PARTNERS I, LLC.

                        Defendants,

-----------------------------------------------------------X

## PRELIMINARY STATEMENT

1.  This action is commenced by the plaintiffs against the defendants under the
Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 (1)(B), 1962
(c) and (d), and 1964 (a) and (c), 1341 and 1343 for damages due to the RCIO enterprise
operated by the defendants by which they manufactured and sold "phantom debt" and
"autofunded" payday loans to the plaintiffs which are not legally collectible.   The defendants
operate this RICO enterprise by means of the predicate crimes of mail fraud and wire fraud, and
the RICO enterprise affected and operated in interstate commerce.

2.  The fraudulent conduct of the defendants has resulted in legal actions against
them by the Federal Trade Commission in federal courts in Kansas, Illinois and New York as a
result of their fraudulent activities and consent orders have been entered against them to enjoin
the defendants from continuing their fraudulent activities.  However, upon information and

belief, the defendants have continued the operation of their RICO enterprise which have resulted in damages to the plaintiffs.

3.   The plaintiffs have also interposed pendent state claims of breach of contract by the Defendants based upon their sale to the plaintiffs of "phantom debt" and uncollectable "autofunded" payday loans.

## PARTIES

## PLAINTIFFS

4.   Plaintiff **LGN International, LCC**, ("LGN") is a Florida limited liability company with an address of 1111 Kane Concourse, Suite 518 Bay Harbor Island, FL 33154.

5.   Plaintiff **Prudent Investimentos LTDA** ("Prudent Investimentos") is a limited liability company established under the laws of Brazil with an address at 145 Avenida Fagundes, Filho, 15 Andar, Vila Monte Alegre, Sao Paulo, SP, CEP 04304-010, Brazil.

## DEFENDANTS

6.   Defendant **Hylan Asset Management, LLC** ("Hylan") is a New York corporation, formerly known as Solex Asset Group, LLC, with its registered address and principal place of business at 5477 Main Street, Amherst, New York, 14221. Hylan transacts or has transacted business in this district and throughout the United States.

7.   Defendant **Andrew Shaevel ("Shaevel")** is, upon information and belief, a resident of the State of New York with an address of 5477 Main Street, Amherst, New York, 14221.  Upon information and belief, Shaevel has been an owner, officer, director, member, and/or manager of Hylan.  At times material to this complaint, acting alone or in concert with

others, Shaevel has formulated, directed, controlled, had the authority to control, or participated

in Hylan's acts and practices, including the acts and practices set forth in this complaint.  Upon

information and belief, among other things, Shaevel has controlled Hylan's finances and

business operations, purchased debt through it and affiliated entities, and signed corporate

papers.

8.  Defendant **Bahamas Marketing Group, LLC** ("BMG") is, upon information

and belief, a corporaton organized in Kansas with an address of 14400 College Blvd., Lenexa,

Kansas 66215.

9.  Defendant **Joel Tucker** is, upon information and belief, a resident of Kansas

with an address of 6299 Nall Avenue, Suite 100, Mission, Kansas 66202.  Upon information and

belief, Tucker has been an owner, officer, director, member, and/or manager of defendant BMG.

At times material to this complaint, acting alone or in concert with others, Tucker has

formulated, directed, controlled, had the authority to control, or participated in acts and practices,

including the acts and practices set forth in this complaint.  Upon information and belief, among

other things, Tucker has controlled BMG's finances and business operations, purchased debt

through it and affiliated entities, and signed corporate papers.

10.  Defendant **SQ Capital, LLC** ("SQ Capital") is, upon information and belief,

a limited liability company organized in Missouri which an address of 6299 Nall Avenue, Suite

100, Mission, Kansas 66202.

11.  Defendant **JT Holdings, Inc.** ("JT Holdings") is, upon information and belief, a corporation organized in Kansas and its sole member is SQ Capital.  Defendant JT Holdings has an address of 6299 Nall Avenue, Suite 100, Mission, Kansas 66202.  Upon information and belief, before JT Holdings adopted its current name in 2010, it was named Bahamas Marking Group, Ltd., BMG.

12.  Defendant **HPD LLC** ("HPD") is, upon information and belief, a Wyoming limited liability company with an address of 2120 Carey Avenue, Cheyenne, Wyoming 82001.  Defendants SQ Capital, JT Holdings, and HPD, upon information and belief, have operated as a common enterprise in unlawful acts and practices as alleged below and are and have all been operated and controlled by defendant Tucker.

13.  Defendant **Hirsh Mohindra** is, upon information and belief, a resident of the State of Illinois with an address of 500 Quail Ridge Drive, Westmont, IL 60559.

14.  Defendant **Mainbrook Asset Partners I, LLC** ("Mainbrook") is, upon information and belief,  a Delaware limited liability company with an address at 3500 South Dupont Highway, Dover, DE 19901.

## JURISDICTION AND VENUE

15.  This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under § 1961¬68 (Racketeer Influenced and Corrupt Organizations Act ("RICO")).  This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. §1367(b).

16.  Venue is also proper for the claims arising under RICO pursuant to 18 U.S.C. § 1965(a) because a substantial part of the events giving rise to the claims occurred in New York, New York.

**THE SCHEME TO MANUFACTURE MARKET,**
**SELL AND COLLECT PHANTOM DEBT**

17.  This is a case against the defendants who, acting as an association-in fact enterprise manufacture, market, sell and collect "phantom debt" and sold to the plaintiffs portfolios of "phantom debt."

18.  The "phantom debt" consisted of two types of purported debts that consumers did not owe.  The first type of "phantom debt" consisted of counterfeit debts fabricated from misappropriated information about consumers' identities and finances.  The second type of "phantom debt" consisted of allegedly bogus "autofunded" payday loans that the fraudulent association-in-fact enterprise of the defendants foisted on consumers without their permission.

**1.  The Creation of the Phantom Debts By**
    **Defendant Tucker and Related Defendants**

19.  Consumer debts that have been charged-off by the original creditors are often sold to third parties for collection or sale to other collectors. Typically, the creditor or seller bundles these debts into what they call "debt portfolios." The portfolios are typically spreadsheets with details about the consumers and their alleged debts.

20.  Starting in or about 2014, defendant Tucker has sold debt portfolios that he allegedly either fabricated or that consisted of purported debts that consumers did not legitimately owe.  Defendant Tucker, upon information and belief, has allegedly marketed counterfeit debts as legitimate consumer debts which are actually owed through a number of different entities.

21.   Defendant Tucker, upon information and belief, has also distributed "debts" from loans that were foisted on consumers without their permission, which he packaged together with other purported debts, and which he sold through defendant BMG.

22.   In addition, defendant Tucker, upon information and belief, is the principal officer and owner of defendants SQ Capital, JT Holdings, and HPD and he has controlled over these companies, and he has directed and controlled them and has used these companies to participate in the manufacture and sale of "phantom debt."

23.   Upon information and belief, defendants Tucker, SQ Capital, JT Holdings, and HPD have operated as a common enterprise in the manufacturing and sale of "phantom debt."

24.   More specifically, when consumer debts that have been charged-off by the original creditors are marketed for sale to third parties, they are typically bundled into debt portfolios.  Debt sellers purchase and sell these debt portfolios for eventual collection by third-party debt collectors.  Upon information and belief, the documentation for the portfolios often includes one or more spreadsheets with tables that list details about individual debts in a portfolio, such as the identity of original creditors; consumers' names, addresses, phone numbers, and social security numbers; original account numbers; original balances; interest rates; charge-off balances; charge-off dates; date the account was opened; and last payment date. Debt collectors use the information in such spreadsheets to identify debtors and demand repayment of the debts identified.

25.   Upon information and belief, using the personal identity information obtained from debt portfolios, defendants Tucker, BMG, SQ Capital, JT Holdings, and HPD marketed, distributed, and sold counterfeit debt portfolios that purport to identify consumers who have defaulted on payday loans.

6

26.  The counterfeit debt portfolios, upon information and belief, list consumer names and contact information along with social security and financial account numbers. For each consumer identified, the portfolios list detailed information about purported payday loans, such as alleged original loan amounts, loan dates, repayment histories, and unpaid balances.

27.  Upon information and belief, the counterfeit debt portfolios also list the purported originators of the payday loans.  Some of the counterfeit debt portfolios list as originator a brand associated with recognized payday loan services, such as "500FastCash," a registered trademark of Red Cedar Services, Inc., used in advertising high-fee, short-term "payday" loans offered at various web sites, including 500fastcash.com.  Some counterfeit debt portfolios list a fictitious entity, such as "Castle Peak," as the purported lender.

28.  These debt portfolios are counterfeit because in numerous instances, they list loans that the identified lenders have not, in fact, made to the identified consumers.

29.  Upon information and belief, defendants Tucker, BMG, SQ Capital, JT Holdings, and HPD have not purchased, or otherwise obtained, any rights to collect loan debts originated by the lenders listed in the counterfeit portfolios, nor have they engaged in any transaction that authorizes them to collect, sell, distribute, or transfer any valid loans originated by those lenders.

30.  Upon information and belief, prior to 2016, Tucker allegedly had access to sensitive consumer information for millions of consumers.  This information included, upon information and belief, consumers' bank account numbers, social security numbers, and other sensitive personal information.  Upon information and belief, Tucker used this information to create or cause to be created fake debt portfolios by matching consumers' personal information to fabricated payday loan debts.  Upon information and belief, Tucker, either directly or through entities under his control, then sold these portfolios of counterfeit debt in spreadsheet format.

Upon information and belief, the portfolios list consumer names and contact information along with social security numbers and financial account information.  Upon information and belief, for each consumer identified, the portfolios provide detailed, but fabricated, information about purported payday loans, such as alleged original loan amounts, loan dates, repayment histories, and unpaid balances.[1]

31.  Upon information and belief, in addition, Tucker, through entities he controlled, including SQ Capital, JT Holdings and HPD LLC, obtained and sold unauthorized payday loan debts.  Upon information and belief, Tucker first sold purported payday loan leads to lenders associated with him.  Upon information and belief, in many instances, these lenders then issued "loans" to consumers identified in the leads without their permission, a practice referred to as "autofunding."  Upon information and belief, the lenders then attempted to withdraw money from consumers' bank accounts as "finance charges" without consumers' consent.  Upon information and belief, when consumers denied the attempted debits, the lenders transferred the unauthorized loans to Tucker as "debts."

32.  Upon information and belief, Tucker, either directly or through entities under his control, sold these debts to debt brokers, including Hylan.  Upon information and belief, Hylan repeatedly purchases and distributes the phantom debt for collection.

33.  On or about December 16, 2016, the United States Federal Trade Commission ("FTC") commenced an action against defendants Tucker, SQ Capital, JT Holdings, and HPD for selling "phantom debt." *See FTC v. Tucker et al., No. 2:16-cv-02816* (D. Kan. filed Dec. 16, 2016) (hereafter the "Kansas FTC Action").[2]

---

[1] These allegations against defendant Tucker are asserted in an FTC's action entitled Federal Trade Commission, et. al. v. Hylan Asset Management, LLC, et. al., 18-cv-00710 (W. D. New York)(hereafter referred to the "New York FTC Action") and the allegations herein are largely reproduced from that New York FTC Action.

[2] Many of the allegations herein against defendants Tucker, SQ Capital, JT Holdings, and HPD are based upon the FTC complaint and are reproduced at length in this complaint.

34.   On September 20, 2017, the Court in the Kansas FTC Action found that defendants Tucker, SQ Capital, JT Holdings, and HPD had, "marketed, distributed and sold counterfeit debt portfolios that purported to represent loans made by a variety of purported originators," in contravention of Section 5 of the FTC Act. *FTC v. Tucker*, No. 2:16-cv-02816 (D. Kan. Sept. 20, 2017), ECF No. 69 at *3.

35.   Significantly, the Court in the Kansas FTC Action entered an order permanently restraining defendants Tucker, SQ Capital, JT Holdings, and HPD from, among other things, "misrepresenting or assisting others in misrepresenting, expressly or by implication the identity, originator, title, ownership, validity or enforceability of a debt." Id.

**2. The Marketing And Sale of Phantom
   Debt By Defendants Hyland and Shaevel**

36.   Upon information and belief, Hylan has operated as a debt broker since at least March 2011.  Among other things, Hylan, upon information and belief, has purchased and sold debt portfolios.  Upon information and belief, Hylan has also placed debt for collection with third parties.

37.   Upon information and belief, starting no later than 2014, Hylan began purchasing phantom debt portfolios from entities controlled by Tucker, through an intermediary, defendant Hirsh Mohindra.

38.   In 2016, the FTC commenced an action against Mohindra, certain other individuals and companies alleged to be acting as part of the common enterprise, for selling counterfeit debt portfolios. *FTC v. Stark Law, LLC*, et al., No. 1:16-cv-3463 (N.D. Ill. filed Mar. 21, 2016) (hereafter the "Illinois FTC Action").

39.  On October 27, 2017, Mohindra agreed in the Illinois FTC Action to the entry of a stipulated judgment that, among other things, banned him from the debt collection industry

and imposed a $47,220,491 judgment. *FTC v. Stark Law, LLC,* No. 1:16-cv-3463 (N.D. Ill. Oct. 27, 2017), at *7, *9.

40.   Upon information and belief, Hylan does not collect on phantom portfolios directly.  Instead, upon information and belief, it "places" them with debt-collection agencies, including the Worldwide Defendants.  Upon information and belief, Hylan also sells phantom debt to other brokers or collectors.

41.   Upon information and belief, Hylan purchases, sells, and places these portfolios despite having notice that consumers do not owe the purported debts.  For example, upon information and belief, by the fall of 2014, a Hylan employee was raising issues internally about the accuracy and veracity of the information contained in the portfolios.  And by November 2014, upon information and belief, Hylan and its owner, Defendant Andrew Shaevel began receiving from collection agencies reports of a high number of consumer complaints stating that consumers did not owe the alleged debts.

42.   Upon information and belief, in a November 2014 email to Mohindra regarding a debt portfolio that originated from Tucker, Shaevel stated, "There is a MAJOR problem with data on this file.  Either there was a data transformation error or there is major FRAUD with this file. [A Hylan employee] discovered that there are debtors with the same name and address that have different SSNs, same bank accounts but different names and/or SSN's. THIS IS NOT KOSHER!" Mohindra assured Shaevel that, "Joel [Tucker] would not and is not frauding over these amounts," and one of Mohindra's employees blamed consumers who input incorrect Social Security numbers during the application process.  Upon information and belief, the employee added that Tucker was willing to replace the $4.79 million of disputed loans. Upon information and belief, Shaevel remained unconvinced, stating, "We understand the business and the data.  These problems are not consistent with the data we have received in the

last $500m of payday loans.  This is a problem that needs to be fixed."  After Mohindra told

Shaevel that he would provide him with "replacement files" and assured him that it was "a non

issu[e]," Shaevel replied "Ok thanks!" Hylan continued to purchase from Mohindra, and sell to

third parties, debts originating from Joel Tucker.[3]

43.    Upon information and belief, likewise, in a November 2014 email, a

collection agency informed Shaevel that a "[c]onsiderable number of people are saying that they

never received the loan and we were able to get a few bank statements showing that there was no

deposit matching the loan amount anywhere near the loan date."[4]

44.    Upon information and belief, in January 2016, Hylan emailed Mohindra an

attachment listing 74 alleged debtors who had signed sworn affidavits denying that they owed

the debts.  Shaevel was copied on the email. Nevertheless, Hylan continued to sell and place

portfolios for collection with third parties.

45.    Upon information and belief, Hylan and Shaevel also received notice that

they had purchased and were selling autofunded "debts."  Upon information and belief, in

February 2015, Shaevel received an email with a news article describing the FTC and CFPB's

actions against the companies engaged in autofunding.  The article described how the purported

lenders in Tucker portfolios "used information from online loan shopping sites to deposit loans

in unwitting consumers' accounts and then repeatedly dinged them for finance charges."  The

article further reported, "When people disputed the debits with their banks, the lenders fabricated

documents that purported to show consumers had agreed to the loans."  Finally, the article noted

that many consumers that tried to stop the unauthorized charges "were hounded by debt

---

[3] See FTC New York Action, complaint ¶ 25.
[4] See FTC New York Action, complaint ¶ 26.

collectors." Shaevel forwarded the email to Mohindra with the added text "FYI.  This might be an issue."[5]

46.  Upon information and belief, within the debt collection industry, BMG debts were notoriously problematic.  On April 7, 2015, a collection agency forwarded to a Hylan employee an email that it had received from another debt seller who was attempting to sell BMG debts. The email stated in part, "At the end of last nights convo I said if you wanted squeaky clean BMG with legit chain [of title] I said go to Hylan.  After speaking with a few companies this morning who have bought this BMG i market and Hylans BMG i hear that it does come with the same issues because the issues lie in the underwriting process from BMG directly and not the companies selling it. ... With BMG you always have to expect issues but if you have experience with BMG these will be normal issues that your agencies are already familiar with."  Shortly after receiving it, the Hylan employee forwarded the email to Shaevel with the comment, "Wow," specifically flagging the issue for him.  The email's reference to "issues [] in the underwriting process" was yet another warning that Tucker-related debts were tainted at the source.[6]

47.  Upon information and belief, despite various reports and voluminous complaints from consumers asserting that they did not actually owe the debts, Hylan and Shaevel did not stop purchasing, selling, and placing Tucker portfolios for collection.  Upon information and belief, nor did they recall Tucker portfolios that they had already placed, or tell purchasers of these portfolios that they contained phantom debt.

48.  Upon information and belief, in numerous instances, using information in debt portfolios marketed, distributed, sold, and placed by Hylan and Shaevel, debt collectors

---

[5] See FTC New York Action, complaint ¶ ¶ 27 & 28.
[6] See FTC New York Action, complaint ¶ 29.

have contacted these consumers, demanded payment, and successfully induced consumers to pay the purported debts. In many instances, the debts in these portfolios were counterfeit or from "autofunded" loans.[7]

49.   On June 26, 2018, the FTC and the Attorney General of the State of New York commenced an action against Hylan, the Worldwide Defendants, and Shaevel, among others, entitled Federal Trade Commission, et. al. v. Hylan Asset Management, LLC, et. al., 18 cv 00710 (W.D. New York)(previously referred to herein as the "FTC New York Action") in which it was alleged that the defendants have manufactured, marketed and collected on "phantom debt."

50.   On June 26, 2019, the Court in the FTC New York Action entered a stipulated order against Hylan, the Worldwide Defendants, Shaevel, among others, permanently restraining and enjoining them from, among other things, "participating in Debt Collection Activities" and from advertising, marketing, promoting, offering for sale, selling, distributing, buying, or processing payments on any Debt or any information regarding a consumer relating to a Debt."

**THE PARTICIPATION AGREEMENT**

51.   Despite being aware that its debtor portfolios consisted of "phantom debt" which were not legally collectible, on or about May 26, 2016, Hylan and Shaevel entered into a participation agreement with LGN to sell LGN a debt portfolio of $70,000,000.00 for the sum of $550,000.00.  Under the terms of the participation agreement, Hylan was to receive a management fee of ten percent (10%) of the Net Collections and Residual Proceeds.

52.   Importantly, in the Participation Agreement Hyan and Shaevel made the following representation:

---

[7] See FTC New York Action, complaint ¶ ¶ 31 & 32.

Title. Company [Hylan] has good, marketable and valid title to, and is the owner of, the Portfolio, free and clear of all Liens. No effective financing statements or like instruments will be on file in any jurisdiction with respect to any of the Company's rights in the Portfolio.

53. Hylan and Shaevel knew that this representation was false and fraudulent because the $70,000,000.00 debt portfolio which they sold to LGN consisted of "phantom debt."

54. Based upon the Participation Agreement, LGN paid to Hylan and Shaevel $500,000.00 for what it believed was a legitimate debt portfolio of $70,000,000.00, but that debt consisted of "phantom debt," which is not legally collectible.

**THE RECEIVABLES PURCHASE AND SALE AGREEMENT**

55. Separately, on November 27, 2015 Prudent Investmentos entered into a receivable purchase and sale agreement with Mainbrook to purchase for $2,000,000.00 a debt portfolio of $200 million.

56. Unbeknownst to Prudent Investmentos, the debtor portfolio consisted of "phantom debt."

57. Based upon the purchase and sale agreement, Prudent Investmentos paid Mainbrook $2,000,000.00 for what it believed was a legitimate debt portfolio of $200 million, but that debt consisted of "phantom debt" which is not legally collectible.

**COUNT I**

**RICO (18 U.S.C. § 1962(C))**
**(AGAINST ALL DEFENDANTS)**

58. The Plaintiffs realleges and incorporates by reference all prior paragraphs 1 through 57 as if set forth fully herein.

59. Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3). At all relevant times, Defendants conducted the affairs of an association-in-fact enterprise-which affected interstate and foreign commerce-through a pattern of racketeering activity, in violation

14

of 18 U.S.C. § 1962(c). 220.  Beginning in at least 2014 and continuing through the present (the "Scheme Period"), the defendants were associated in fact and comprised an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) willfully and with actual knowledge of the illegality of their actions and those of the enterprise.  The Defendants acting as an association-in-fact enterprise is engaged in, and its activities affect, interstate and foreign commerce.

60.  The Defendants' association-in-fact enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, they have been involved in the manufacturing, marketing, sales and collection of "phantom debt" and this enterprise has oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme, each of which caused direct harm to the Plaintiffs.

61.  During the Scheme Period, each of the Defendants agreed to and did conduct and participate in the affairs of the association-in-fact enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).  It was the purpose of the Defendants' association-in-fact enterprise to manufacture, market, sell and collect "phantom debt" to cause the Plaintiffs, and others, to believe that the debt portfolios which the Defendants sold to the Plaintiffs represented legitimate debts which were legally collectible when in fact the debt portfolios consisted of "phantom debt" which were not collectible.  The manufacture, marketing, sale, and collection of "phantom debt" were intended to, and did in fact, resulted in substantial profits to the Defendants as part of their association-in-fact enterprise.

62.  The Defendants' association-in-fact enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341and  (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§ 1961(1)(B), and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

63.   Specifically, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud the Plaintiffs, and to manufacture, market, sell and collect "phantom debt", each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of: (i) manufacturing "phantom debt"; (ii) marketing the "phantom debt" and selling the "phantom debt" portfolios to the Plaintiffs and others, and to engage in collection activities of the "phantom debt" as described herein; and (iii) communicating and coordinating with one another in the manufacturing, marketing, selling and collection of "phantom debt" through email, U.S. mail, and phone.  The association-in-fact enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341 and (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§ 1961(1)(B), and 18 U.S.C. § 1512, and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

64.   In particular, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings included, upon information and belief, among others, a November 2014 email to Mohindra regarding a debt portfolio that originated from Tucker in which Shaevel stated, "There is a MAJOR problem with data on this file. Either there was a data transformation error or there is major FRAUD with this file;" various emails which were sent and received by Hylan in April,

2015 concerning debt portfolios which were being marketed by BMG and an email in January 2016 from Hylan to Mohindra on which Shaevel was copied and which contained attachment listing 74 alleged debtors who had signed sworn affidavits denying that they owed the debts.

65.   Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, and each causing direct injury to the Plaintiffs.

66.   The total number of phone calls, e-mails, and mailings is not yet known, but the use by the Defendants of the interstate wires and mails was widespread and pervasive in furtherance of their fraudulent scheme of manufacturing, marketing, selling and collecting "phantom debt."

67.   In addition, the Defendants used extortive threats in their collection practices to get customers to pay the purported debts, by threatening to, among other things, contact customers' family members or other third parties and such threats constituted extortion and other crimes in violation of 18 U.S.C. § 875-77, 880 and 18 U.S.C. § 1512.

68.   Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the association-in-fact enterprise's fraudulent scheme, and the Defendants engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its falsity.  Each of the Defendants performed or participated in the performance of at least two of the predicate acts.

69.   The conduct and actions set forth herein were related to each other by virtue of: (a) common participants; (b) a common victim; and (c) the common purpose and common result of which was to get the Plaintiffs to purchase portfolios of "phantom debt."

70.  The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to manufacture, market, sell, and collect "phantom debt."

71.  The Defendants' direct and indirect participation in the association-in-fact enterprise's affairs through the pattern of racketeering activity described herein constitutes a violation of 18 U.S.C. § 1962(c).

72.  As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(c), the Plaintiffs have sustained damage to their business and property, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth herein. Plaintiffs' damages include, but are not limited to: lost revenue, profits, and business opportunities.

73.  As a result of the violations of 18 U.S.C. § 1962(c), the Plaintiffs have suffered damages in an amount to be proven at trial, but which Plaintiffs themselves estimates to be not less than $5 million.  The Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the association-in-fact enterprise in violations of 18 U.S.C. § 1962(c).

## COUNT II

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(a)
### (AGAINST ALL DEFENDANTS)

74. The Plaintiffs realleges and incorporates by reference all prior paragraphs 1 through 73 as if set forth fully herein.

75. The association-in-fact of the Defendants is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in, or the activities of which affected, interstate and/or foreign commerce.

76. In furtherance of the association-in-fact enterprise, Defendants committed the predicate racketeering acts as pleaded herein. The purpose of the association-in fact enterprise was to manufacture, market, sell, and collect "phantom debt."

77. The association-in fact enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341 and  (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§1961(1)(B).

78. In conducting the affairs of the association-in-fact enterprise, the Defendants used and invested income that was derived from the pattern of racketeering activity, directly or indirectly, in the operations of their association-in-fact enterprise, and respective businesses,  and which are entities and enterprise engaged in, and the activities of which affect, interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a).  Specifically, the Defendants used funds they fraudulently procured through the alleged pattern of predicate acts to: (a) fund their individual businesses and to continue the activities of their association-in fact enterprise.

79. Accordingly, the racketeering activity consisted of multiple, related acts perpetrated during the Scheme Period that are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1341 (relating to mail fraud) as well as the other predicate acts alleged herein that are within the scope of 18 U.S.C. § 1961(1)(B) and (5).

80. As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(a), the Plaintiffs have sustained damage to their business and property, including injury by

reason of the predicate acts constituting the pattern of racketeering activity set forth above, including lost revenue, profits, and business opportunities.

81.   As a result of the violations of 18 U.S.C. § 1962(a), the Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which has been estimated as not less than $5 million.  The Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Defendants' violations of 18 U.S.C. § 1962(a).

## COUNT III

### CONSPIRACY IN VIOLATION OF RICO, 18 U.S.C. § 1962(d)
### (AGAINST ALL DEFENDANTS)

82.   The Plaintiffs realleges and incorporates by reference all prior paragraphs 1 through 81 as if set forth fully herein.

83.   During the Scheme Period, each of the Defendants willfully, knowingly and unlawfully conspired to, and did further the efforts of the association-in-fact enterprise to perpetrate the scheme against the Plaintiffs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 1962(a).

84.   In furtherance of the conspiracy and to effectuate its objectives, each of the Defendants agreed that the following predicate acts, among others, would be committed by one or more members of the conspiracy: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§ 1961(1)(B, and (iii) extortion and other crimes in violation of 18 U.S.C. § 875-77, 880 and 18 U.S.C. § 1512, and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

85.  Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Defendants, for the purpose of executing the scheme to manufacture, market, sell and collect "phantom debt."

86.  It was specifically intended and foreseen by the Defendants that the association-in-fact enterprise would engage in, and conduct activities which affected interstate commerce.

87.  Each Defendant was aware of the various racketeering schemes, assented to the efforts of the association-in-fact enterprise to carry out these acts, and acted in furtherance of the conspiracy.

88.  The pattern of racketeering consisted of multiple acts of racketeering by each of the Defendants.  The activities of these Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.  These activities extended for several years, and continued up to the commencement of this action.  The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), in violation of 18 U.S.C. § 1962(d).

89.  Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), and the overt acts taken in furtherance of that conspiracy.

90.  The Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above. The

the Plaintiffs' damages include, but are not limited to: lost revenue, profits, and business opportunities.

91.  As a result of the violations of 18 U.S.C. § 1962(d), the Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which the Plaintiffs have estimated as not less than $5 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Defendants' violations of 18 U.S.C. § 1962(d).

## STATE LAW CLAIMS

### COUNT IV

92.  The Plaintiffs realleges and incorporates by reference all prior paragraphs 1 through 91 as if set forth fully herein.

93.  LGN entered into a participation agreement by which it agreed to purchase from Hylan debt portfolio of $70,000,000.00 for the sum of $500,000.00.

94.  Hylan breached its contract by failing to deliver to LGN $70,000,000.00 in legitimate and collectable debts, but instead sold LGN "phantom debt".

95.  As a result, LGN has been damaged in the amount of $70,000,000.00.

### COUNT V

96.  The Plaintiffs realleges and incorporates by reference all prior paragraphs 1 through 95 as if set forth fully herein.

97.  Prudent Investimentos entered into a participation agreement by which it agreed to purchase from Mainbrook debt portfolio of $200,000,000.00.

98.  Mainbrook breached its contract by failing to deliver to Prudent Investimentos $200,000,000.00 in legitimate and collectable debts, but instead sold Mainbrook "phantom debt".

99.  As a result, Prudent Investimentos has been damaged in the amount of $200,000,000.00.

WHEREFORE, the plaintiffs demand judgment on the Count I of their complaint in an amount to be proven at trial, but which the Plaintiffs have estimated as not less than $5 million; on the Count II of their complaint in an amount to be proven at trial, but which the Plaintiffs have estimated as not less than $5 million; on the Count III of their complaint in an amount to be proven at trial, but which the Plaintiffs have estimated as not less than $5 million; on the Count IV of their complaint in an amount of $70,000,000.00 and on the Count V of their complaint in an amount of $200,000,000.00, plus the costs and disbursements of this action, including attorneys' fees.

Dated: New York, New York
        April 21, 2020

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

*ANNA VAL*

_____
Anna Val, Esq.
BROADWAY LEGAL, P.C.
Attorneys for Plaintifs
348 Coney Island Avenue, # 1014
Brooklyn, New York 11218
(516) 591-0091
Email: annaval@lawyer.com